IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 10-22777-CIV-MOORE/SIMONTON

NEW HOPE POWER COMPANY, and
OKEELANTA CORPORATION,

    Plaintiffs,

vs.

UNITED STATES ARMY CORPS OF
ENGINEERS and STEVEN L. STOCKTON,
in his official capacity as Director of Civil
Works, United States Army Corps of
Engineers,

    Defendants.
_____/

## CORRECTED ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND FOR SUMMARY JUDGMENT; DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT[1]

THIS CAUSE came before the Court upon Plaintiffs' Motion for Preliminary Injunction and for Summary Judgment (ECF No. 18) and Defendants' Cross-Motion for Summary Judgment (ECF No. 27). These motions are now fully briefed.

UPON CONSIDERATION of the Motions, the Responses, the Replies, the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

**I.    BACKGROUND**

Plaintiffs in this case are Okeelanta Corporation ("Okeelanta"), a Florida sugarcane grower, and New Hope Power Company ("New Hope"), a renewable energy company. In this

---

[1] This Corrected Order includes typographical changes and no substantive changes have been made.

action, brought pursuant to the Administrative Procedure Act ("APA"), Plaintiffs allege that Defendants United States Army Corps of Engineers ("the Corps") and Steven L. Stockton ("Stockton"), the Corps' Director of Civil Works, have improperly extended the Corps' jurisdiction under the Clean Water Act ("CWA") by enacting new legislative rules related to prior converted croplands[2] without allowing the required public notice period. Specifically, Plaintiffs allege that Defendants' new rules have improperly extended the Corps' jurisdiction to situations where (1) prior converted croplands are converted to non-agricultural use; and (2) dry lands are maintained using continuous pumping. Under this new rule, wetland determinations are made based on what the property's characteristics would be if the pumping ceased. Therefore, Plaintiffs seek to have the new rules set aside.

> A. History of the CWA

The CWA is a statute which seeks to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Since 1972, pursuant to section 404 of the CWA, the Corps has regulated the "navigable waters" of the United States. See 33 U.S.C. § 1344(a). "Wetlands" are considered "navigable waters" that are defined as "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas." 33 C.F.R. § 328.3(b) (emphasis added).

In 1977, the Corps released Final Rules that clarified that the phrase "under normal

---

[2] Prior converted croplands are "areas that, prior to December 23, 1985, were drained or otherwise manipulated for the purpose, or having the effect, of making production of a commodity crop possible." 58 Fed. Reg. 45008-01, at 45031 (Aug. 25, 1993).

circumstances" in the regulation does not refer to properties "that once were wetlands and part of an aquatic system, but which, in the past, have been transformed into dry land for various purposes." 42 Fed. Reg. 37122, 37122 (July 19, 1977). Thus, former wetlands that were altered to dry land before the CWA's passage were exempted from the delineation of "wetlands."

In 1986, the Corps released a Regulatory Guidance Letter ("RGL") stating:

> [I]t is our intent under Section 404 to regulate discharges of dredged or fill material into the aquatic system as it exists and not as it may have existed over a record period of time. The wetland definition is designed to achieve this intent. [] Many areas of wetlands converted in the past to other uses would, if left unattended for a sufficient period of time, revert to wetlands solely through the devices of nature. However, such natural circumstances are not what is meant by 'normal circumstances' in the definition quoted above. 'Normal circumstances' are determined on the basis of an area's characteristics and use, at present and recent past. Thus if a former wetland has been converted to another use [other than by recent unauthorized activity] and that use alters its wetland characteristics to such an extent that it is no longer a 'water of the United States,' that area will no longer come under the Corps' regulatory jurisdiction for purposes of Section 404.

RGL 86-9 (Aug. 27, 1986) (ECF No. 18-10); see also RGL 05-06 (Dec. 7, 2005) (ECF No. 18-11) (stating that RGL 86-9 still applies).

B. Wetlands Manual

In 1987, the Corps released a Wetlands Delineation Manual ("Wetlands Manual") which the Corps' personnel follow in making wetland determinations. See Defs.' Counter Statement of Facts ¶ 7 (ECF No. 27-9). According to the updated online edition of the Wetlands Manual, use of the 1987 Manual is mandatory in making wetlands determinations. See Wetlands Manual (ECF No. 18-13), at vii. The Wetlands Manual requires present evidence of wetland indicators as to the hydrology, soil and vegetation of the land to make "a positive wetland determination." Id. at v, 10. The Wetlands Manual provides an exception to this rule for atypical situations such

as where unauthorized activities, natural events, or manmade wetlands are involved. Id. at 73-74. A situation is not considered atypical where "areas have been drained under [the Corps'] authorization or that did not require [the Corps'] authorization." Id. at 74.

C. Prior Converted Croplands

In 1993, the Corps indicated in its regulations that "[w]aters of the United States do not include prior converted cropland." 33 C.F.R. § 328.3(a)(8). In a joint final rule by the EPA and the Corps, the agencies stated that:

> By definition, [prior converted] cropland has been significantly modified so that it no longer exhibits its natural hydrology or vegetation. Due to this manipulation, [prior converted] cropland no longer performs the functions or has the values that the area did in its natural condition. [Prior converted] cropland has therefore been significantly degraded through human activity and, for this reason, such areas are not treated as wetlands under the Food Security Act. Similarly, in light of the degraded nature of these areas, we do not believe that they should be treated as wetlands for the purposes of the [CWA].

58 Fed. Reg. 45008-01, at 45032. Moreover, the agencies stated that:

> In response to commentors who opposed the use of [prior converted] croplands for non-agricultural uses, the agencies note that today's rule centers only on whether an area is subject to the geographic scope of CWA jurisdiction. This determination of CWA jurisdiction is made regardless of the types or impacts of the activities that may occur in those areas.

Id. at 45033. The only method provided for prior converted croplands to return to the Corps' jurisdiction under this regulation is for the cropland to be "abandoned," where cropland production ceases and the land reverts to a wetland state. Id.

D. Jacksonville Issue Paper

In January 2009, the Corps' Jacksonville Field Office prepared an Issue Paper announcing for the first time that prior converted cropland that is shifted to non-agricultural use becomes

4

subject to regulation by the Corps. See Issue Paper Regarding "Normal Circumstances" (ECF No. 18-22) (the "Issue Paper"). This paper was written in response to five pending applications for jurisdictional determinations involving the transformation of prior converted cropland to limestone quarries. The Issue Paper concluded that such a transformation would be considered an "atypical situation" within the meaning of the Wetlands Manual and, thus, subject to regulation. Id. at 1-5. The Issue Paper further found that active management such as continuous pumping to keep out wetland conditions was not a "normal condition" within the meaning of 33 C.F.R. § 328.3(b). This Issue Paper was sent to the Corps' headquarters along with a request for guidance as to whether the Issue Paper reflected the Corps' rules. The Issue Paper was adopted as being an accurate reflection of the Corps' national position by Stockton in an Affirming Memorandum. See Memorandum for South Atlantic Division Commander (Apr. 30, 2009) (ECF No. 18-23) ("Affirming Memorandum").[3] No notice-and-comment period occurred before this memorandum issued. The Corps has implemented and enforced the Stockton Rules nationwide since the Affirming Memorandum issued, and the Corps has issued additional memoranda supporting this policy.

> E.  New Hope's Proposed Ash Monofill

New Hope runs a renewable energy facility on Okeelanta's property. This property is located on a mill lot (the "Mill Lot") that was previously used to farm sugarcane. In 1993, the Corps indicated in a letter that the property was a prior converted wetland and thus, New Hope did not need a permit to build a renewable energy facility. See Letter from Charles A. Schnepel,

---

[3] The Issue Paper and Affirming Memorandum are collectively referred to as the "Stockton Rules."

Chief, Regulatory Section, the Corps' Miami Field Office to John M. Bossart, KBN Engineering (May 26, 1993) (ECF No. 18-3). This renewable energy facility was eventually built. New Hope now seeks to construct an ash monofill[4] near the renewable energy facility on the same Mill Lot. The hydrology of the Mill Lot is such that drains, pumps and other devices are used to prevent the area from becoming saturated with water.

On September 1, 2009, after the Corps became aware of the proposed construction, the Corps notified New Hope that "commencement of the proposed work prior to Department of the Army authorization would constitute a violation of Federal laws and subject [New Hope] to possible enforcement action." Letter from Krista Sabin, Project Manager, Jacksonville District Corps of Engineers to Rebecca Kelner, P.E., Jones Edmunds & Assocs. (Sept. 1, 2009) (ECF No. 18-33).

New Hope responded by asking whether the Corps' correspondence with New Hope established "the final decision on how these jurisdictional rules will be applied," and whether individual exceptions might apply. Email from Eric Reusch to Neal McAliley (May 29, 2009) (ECF No. 18-31). The Corps' Jacksonville field office responded that all projects which involved a change from agricultural to non-agricultural use would be assessed based on this approach. Id. In subsequent correspondence, the Corps indicated that "commencement of the proposed work [on the monofill] prior to . . . authorization [from the Corps] would constitute a violation of the federal laws and subject you to possible enforcement action. Receipt of a permit from the Florida Department of Environmental Protection . . . does not obviate the requirement

---

[4] The ash monofill would essentially serve as a landfill for waste from the renewable energy facility. This would save New Hope the expense of shipping the waste elsewhere.

6

for obtaining [the Corps'] permit prior to commencing the proposed work." Letter from Krista Sabin, Project Manager, Jacksonville District Corps of Engineers to Rebecca Kelner, P.E., Jones Edmunds & Assocs. (Sept. 1, 2009) (ECF No. 18-33).

On December 23, 2009, Plaintiffs filed the Complaint in the current action under the APA seeking to set aside the Stockton Rules. See Complaint (ECF No. 1). The Complaint alleges that the Stockton Rules improperly (1) create a new rule that wetland exemptions for prior converted croplands are lost upon conversion to non-agricultural use (Count I); (2) create a new rule for circumstances where dry lands are maintained using continuous pumping. Under this new rule, wetland determinations are made based on what the property's characteristics would be if the pumping ceased; (3) create a new interpretation that wetland exemptions for prior converted croplands are lost upon conversion to non-agricultural use (Count III); (4) create a new interpretation for circumstances where dry lands are maintained using continuous pumping (Count IV); (5) are unconstitutionally vague rules; and (6) create rules in excess of statutory authority. Plaintiffs now seek summary judgment in their favor on all claims, entitling them to relief in the form of setting aside and vacating the Stockton Rules. Defendants seek summary judgment on all claims and dismissal of the action.

## II.   JURISDICTION

### A.   Finality

Defendants allege that this claim must be dismissed because the challenged rules are not final. Plaintiffs bring this action pursuant to 5 U.S.C. § 704 of the APA, which provides:

> Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. . . . Except as otherwise expressly required by statute, agency action otherwise final is final for the

purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

5 U.S.C. § 704. Plaintiffs claim that this section allows them to obtain review of Defendants' alleged violation of the notice-and-comment requirements found in 5 U.S.C. §§ 552-53.

Thus, the crux of the jurisdictional question is whether the agency action in this case is "final." The ambiguity of this word is well described in a recent journal article:

> Stated broadly, a decision is final when an agency concludes its process. A party will experience an agency decision, such as a guidance, as truly final, especially if the substance of that action reasonably compels that party to make meaningful changes to its conduct. An agency, on the other hand, may have a very different perspective, considering a matter final only when it has exercised any and every regulatory option pertinent to that issuance. These two perspectives do not meld easily.

Gwendolyn McKee, Judicial Review of Agency Guidance Documents: Rethinking the Finality Doctrine, 60 Admin. L. Rev. 371, 373-74 (2008). To provide guidance in addressing this ambiguity, the Supreme Court has focused on two conditions which must be satisfied for agency action to be considered "final" for the purpose of APA review under section 704: (1) "the action must mark the consummation of the agency's decisionmaking process"; and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (citations and internal quotation marks omitted); accord Franklin v. Massachusetts, 505 U.S. 788, 797 (1992) ("The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties."); Tenn. Valley Auth. v. Whitman, 336 F.3d 1236, 1248 (11th Cir. 2003) (looking at "(1) whether the agency action constitutes the agency's definitive position; (2) whether the action has the status of law or affects the legal rights and

8

obligations of the parties; (3) whether the action will have an immediate impact on the daily operations of the regulated party; (4) whether pure questions of law are involved; and (5) whether pre-enforcement review will be efficient") (citing FTC v. Standard Oil of Cal., 449 U.S. 232, 239-43 (1980)).

Here, Plaintiffs argue that the Corps' changes in rules regarding prior converted croplands without a notice-and-comment period was improper.[5] The first Bennett prong, consummation of policymaking, is met here because the decision to implement the challenged policy has been completed using definitive language and no further modification of the policy is being considered. See, e.g., City of Dania Beach, Fla. v. F.A.A., 485 F.3d 1181, 1187-88 (D.C. Cir. 2007) (first prong met where nothing in agency letter suggested its "statements and conclusions are tentative, open to further consideration, or conditional on future agency action"). This conclusion is further bolstered by the fact that the challenged policy has now been in place for over a year and has been uniformly implemented throughout the United States.

The second Bennett prong, legal consequences, has also been met. Prior to the shift in policy caused by the Stockton Rules, prior converted croplands were exempt from CWA regulation unless they were abandoned. Following the issuance of the Stockton Rules, prior converted croplands are no longer automatically exempt from CWA – rather they will be subject to regulation where they are converted to non-agricultural use or where they involve continuous pumping. In other words, the Corps' central office has given the field offices their new

---

[5] As discussed in Section III, it is well settled that administrative agencies may only issue rules after following a notice-and-comment period. 5 U.S.C. §§ 552-53; Cmty. Nutrition Inst. v. Young, 818 F.2d 943, 946 (D.C. Cir. 1987).

"marching orders" using mandatory language with respect to prior converted croplands, which the field offices are now implementing. Appalachian Power Co. v. E.P.A., 208 F.3d 1015, 1023 (D.C. Cir. 2000) (holding that an agency guidance document had "legal consequences" when the agency "has given the States their 'marching orders'"); see also City of Dania Beach, Fla., 485 F.3d at 1188 (same); Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 479 (2001) ("Though the agency has not dressed its decision with the conventional procedural accoutrements of finality, its own behavior thus belies the claim that its interpretation is not final.").[6]

Moreover, the remaining prongs cited by the Eleventh Circuit all suggest finality. See Tenn. Valley Auth., 336 F.3d at 1248. The third prong, immediate impact, is met because Plaintiffs' plans to begin preliminary construction of their monofill are being interrupted. The fourth prong is met because this case almost exclusively involves issues of law. The present challenge does not involve factual determinations, but rather the procedural sufficiency of the policy that the Corps seeks to implement. This determination only requires an analysis of undisputedly authentic Corps documents. The fifth prong, effective pre-enforcement review, is met because the Court can finally decide the legal issues before it and completely resolve the dispute.

Defendants' counter-arguments are unpersuasive. Many of the cases they cite are inapplicable because they involve pre-enforcement lawsuits that challenged applications of the Corps' regulations or legal rules rather than the enactment of the Corps' regulations or rules

---

[6] The Court acknowledges that some cases, also from the D.C. Circuit, have interpreted the second prong in Bennett more rigidly. See, e.g., Nat'l Ass'n of Home Builders v. Norton, 415 F.3d 8 (D.C. Cir. 2005). These cases apply Bennett so rigidly as to entirely preclude review of some types of agency actions. See McKee, Judicial Review, supra, at 400-02.

themselves. See, e.g., Fairbanks N. Star Borough v. U.S. Army Corps of Eng'rs, 543 F.3d 586 (9th Cir. 2008) (holding no jurisdiction existed where property owner challenged factual determination by the Corps but no regulation was challenged); St. Andrews Park, Inc. v. U.S. Dep't of Army Corps of Eng'rs, 314 F. Supp. 2d 1238 (S.D. Fla. 2004) (challenging the facts that formed the basis of a preliminary jurisdictional determination); Defendants' Brief in Opposition (ECF No. 26) ("Defs.' Opp'n"), at 13-21. These cases focused on the Bennett prong regarding lack of legal consequences, and found that the preliminary factual pronouncements of the field offices did not have legal consequences. Here, by contrast, the agency documents challenged were documents created by the Corps' headquarters and involved a pronouncement of new agency-wide legal rules directing how jurisdiction should be determined. The Stockton Rules cover an entirely new category of property and the Corps' field offices have been directed to follow these new rules, and the legal consequence is that Plaintiffs now have to follow rules that previously did not exist. Therefore, for all the above reasons, the Court finds that the Stockton Rules were a final agency action and the Court has subject matter jurisdiction over the claim.

B.   Ripeness

Defendants next challenge the ripeness of Plaintiffs' claims. The Eleventh Circuit recently described the ripeness doctrine as follows:

> The ripeness doctrine is one of the several strands of justiciability doctrine that go to the heart of the Article III case or controversy requirement. While standing concerns the identity of the plaintiff and asks whether he may appropriately bring suit, ripeness concerns the timing of the suit. The function of the ripeness doctrine is to protect federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes. To determine whether a claim is ripe, we assess both the fitness of the issues for judicial decision and the hardship to the parties of withholding judicial review. The fitness prong is typically concerned with questions of finality, definiteness, and the extent to which resolution of the challenge

11

>depends upon facts that may not yet be sufficiently developed. The hardship prong asks about the costs to the complaining party of delaying review until conditions for deciding the controversy are ideal.

Mulhall v. UNITE HERE Local 355, --- F.3d ----, 2010 WL 3526078, at *8 (11th Cir. Sept. 10, 2010) (ellipses, quotation marks and citations omitted). Here, Defendants argue that Plaintiffs' claims are not yet ripe because (1) additional facts would benefit the Court, and (2) Plaintiffs will suffer no hardship if they cannot seek immediate review. Defs.' Opp'n at 21-25. With respect to the first argument, this Court does not believe that additional site-specific information regarding Plaintiffs' property is necessary to resolve this case. Any administrative review would only involve the new rules' applicability to the facts of Plaintiffs' case, and not involve a review of the policy itself. Plaintiffs nowhere dispute the fact that if the new rules apply, then the subject property would qualify as wetlands. Thus, the issue before the Court is one of law, and factual development would not assist the Court. As to the second prong, a real and heavy burden is being placed on Plaintiffs by Defendants' actions. According to uncontested evidence, creation of the ash monofill would save New Hope $1.4 million a year. The Corps' shift in policy is the only current barrier to commencing construction of the monofill. Thus, a delay in review of this claim would be highly expensive to Plaintiffs. Therefore, considering these two factors, this Court finds Plaintiffs' claims to be ripe for adjudication.

### III.  MERITS

#### A.  Standard of Review

The applicable standard for reviewing a summary judgment motion is stated in Rule 56(c) of the Federal Rules of Civil Procedure:

>The judgment sought should be rendered if the pleadings, the

12

>discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment may be entered only where there is no genuine issue of material fact. Twiss v. Kury, 25 F.3d 1551, 1554 (11th Cir. 1994). The moving party has the burden of meeting this exacting standard. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Id.

In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. Id. However, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

B.    Analysis

Plaintiffs allege that Defendants improperly issued new agency rules without using the appropriate notice-and-comment procedures required by the APA. The APA provides that "[g]eneral notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served or otherwise have actual notice

13

thereof in accordance with law." 5 U.S.C. § 553(b). It further requires that

> After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose.

5 U.S.C. § 553(c). The notice-and-comment requirements contained in 5 U.S.C. §§ 553 are not mere formalities. As the D.C. Circuit has observed, "the notice requirement improves the quality of agency rulemaking by exposing regulations to diverse public comment, ensures fairness to affected parties, and provides a well-developed record that enhances the quality of judicial review." Sprint Corp. v. F.C.C., 315 F.3d 369, 374 (D.C. Cir. 2003).

The notice-and-comment requirements apply to all agency rules, which are defined broadly as "means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . ." 5 U.S.C. §§ 551(4), 553. The exceptions to the notice-and-comment procedures include agency rules that are "interpretative rules, general statements of policy, or rules of agency organization, procedure." 5 U.S.C. § 553(b)(3)(A).

Here, Defendants do not claim that the Corps engaged in the appropriate notice-and-comment procedures. Rather, they argue that the Stockton Rules are mere policy statements that are not subject to notice-and-comment requirements. Plaintiffs claim that the Stockton Rules limit the discretion of Corps' field offices to such a degree that they constitute legislative rules. In trying to distinguish between legislative rules and policy statements, courts have found that "if a document expresses a change in substantive law or policy (that is not an interpretation) which

14

the agency intends to make binding, or administers with binding effect, the agency may not rely upon the statutory exemption for policy statements, but must observe the APA's legislative rulemaking procedures." Gen. Elec. Co. v. E.P.A., 290 F.3d 377, 383-84 (D.C. Cir. 2002). Similarly, courts look to whether the agency establishes a new "binding norm." Nat'l Min. Ass'n v. Sec'y of Labor, 589 F.3d 1368, 1371 (11th Cir. 2009). "The key inquiry, therefore, is the extent to which the challenged policy leaves the agency free to exercise its discretion to follow or not to follow that general policy in an individual case." Id. (citation omitted); see also Cmty. Nutrition Inst., 818 F.2d at 946 (looking at the binding nature of the document and whether it leaves the agency's decisionmakers with discretion). Courts also look to the agency's expressed intention, "whether the statement was published in the Federal Register or the Code of Federal Regulations," and the statement's binding effects on private individuals. Id.

  In the present action, there has been a definite shift in the Corps' substantive rules regarding what the Corps considers wetlands. As noted above, before the Stockton Rules, prior converted cropland that was shifted to non-agricultural use was treated as exempt. Following the Stockton Rules, the opposite was true. Similarly, prior to the Stockton Rules, continuous pumping to preserve a converted cropland's state did not impact a property's entitlement to a prior converted cropland designation. Following the Stockton Rules, the opposite was true. Thus, the Stockton Rules broadly extended the Corps' jurisdiction and sharply narrowed the number of exempt prior converted croplands.

  Defendants argue that no such shift occurred. Defendants argue that prior converted croplands that changed to non-agriculture use are an atypical situation which leads to loss of the exemption. This position is inconsistent with prior agency documents. The Corps' regulations

state that "[w]aters of the United States do not include prior converted cropland." 33 C.F.R. §328.3(a)(8). In the related final rule by the EPA and the Corps, the only means for this status to be lost is abandonment, which requires the land to revert to a present wetlands state. See 58 Fed. Reg. 45008-01, at 45033. In other words, under the prior rule, an exemption would not be lost because a prior converted cropland shifts to nonagricultural use. See, e.g., United States v. Hallmark Const. Co., 30 F. Supp. 2d 1033, 1040 (N.D. Ill. 1998) (holding that even if prior converted cropland had switched to nonagricultural use, no wetland designation existed); RGL 86-9 ("if a former wetland has been converted to another use [other than by unauthorized use] . . . that area will no longer come under the Corps' regulatory jurisdiction"). Moreover, no mention was made of whether the converted state was preserved by pumping or otherwise. Thus, the Corps' new rule creates a second exception, in addition to abandonment, whereby prior converted croplands can lose their exempt status.

Additionally, the new rule also breaks from the plain language of the Wetlands Manual, which is by its terms binding on the field offices. The Wetlands Manual requires that, before an area is designated a wetland, the Corps must find present evidence of wetland indicators as to the hydrology, soil and vegetation. Wetlands Manual at v, 10. The only and exclusive exceptions to this generally applicable definition are atypical situations where unauthorized activities, natural events, or manmade wetlands are involved. Id. at 73-74. Though Defendants attempt to shoehorn the Stockton Rules regarding conversion to non-agricultural usage under the atypical situations exceptions section, none of the existing exceptions include the conversion of prior converted cropland to non-agricultural uses. The only remotely pertinent atypical situation exception is for unauthorized activities, but by its terms, the exception for unauthorized activities

does not apply where "areas have been drained under [the Corps'] authorization or that did not require [the Corps'] authorization." Id. at 74. It is undisputed that Plaintiffs' prior converted croplands did not require the Corps' authorization when they were originally drained, and so this atypical exception does not apply.

Defendants also argue that continuous pumping to preserve a non-wetland state is not a "normal circumstance" within the meaning of 33 C.F.R. § 328.3(b); rather, the normal state must be judged by what conditions would return if pumping ceased. This position is impossible to reconcile with prior agency positions, including the repeatedly reaffirmed position that many "wetlands converted in the past to other uses would, if left unattended for a sufficient period of time, revert to wetlands solely through the devices of nature. However, such natural circumstances are not what is meant by 'normal circumstances.'" RGL 86-9; RGL 05-06 (stating that RGL 86-9 still applies).[7] Similarly, Defendants' position is contradicted by the Wetlands Manual's requirement that the Corps only looks at present evidence, or evidence from the recent past, to make wetlands determinations. No provision exists in the manual to determine hypothetical conditions that may return upon abandonment when examining "normal circumstances."

Defendants also argue that Stockton does not even have the power to implement new

---

[7] Defendants cite to RGL 90-07 (ECF No. 26-6), which expressly re-affirms the "normal circumstances" definition contained in RGL 86-9, but notes that unauthorized active pumping used to destroy recently existing wetlands characteristics cannot be used to eliminate wetlands jurisdiction. Such a scenario would be an atypical situation under the Wetlands Manual because it involves an unauthorized use of pumping. The pumping covered by the Stockton Rules, by contrast, includes authorized pumping such as pumping on prior converted croplands that have long been exempt from regulation. Thus, RGL 90-07 does not support Defendants' position.

final rules, and thus the Stockton Rules could not create a binding new norm. The record makes clear that, whether or not Stockton has the authority to implement new rules, he has done so.[8] Defendants have admitted that the Stockton Rules are the Corps' current policy. If anything, Defendants' argument suggests that the new rules should be set aside because rules that are normatively binding are emerging from unauthorized individuals. Thus, for all the above reasons, the Stockton Rules constitute new legislative and substantive rules, and create a binding norm. Therefore, the Stockton Rules and their progeny were procedurally improper because no notice-and-comment procedures were used. Accordingly, the Stockton Rules must be set aside.[9]

## IV. CONCLUSION

For the foregoing reasons, it is

ORDERED AND ADJUDGED that Plaintiffs' Motion for Preliminary Injunction and for Summary Judgment (ECF No. 18) is GRANTED IN PART. The Court hereby SETS ASIDE the Corps' Issue Paper Regarding "Normal Circumstances" (ECF No. 18-22) and Memorandum for South Atlantic Division Commander (Apr. 30, 2009) (ECF No. 18-23) in their entirety. The Corps may not, without engaging in rulemaking using appropriate notice-and-comment procedures, determine the existence of wetlands in a manner inconsistent with this Order.[10] It is further,

---

[8] Similarly, the Court does not afford much weight to the fact that the Stockton Rules were not published in the Federal Register or the Code of Federal Regulations, as the very issue in front of the Court is whether the Corps circumvented use of rulemaking formalities.

[9] Because this analysis of Claims One and Two is sufficient to decide the issue before the Court, the Court does not reach the remaining claims.

[10] Plaintiffs' request for injunction is mooted by the granting of final relief.

18

ORDERED AND ADJUDGED that Defendants' Cross Motion for Summary Judgment (ECF No. 27) is DENIED. Plaintiffs' Motion for Hearing (ECF No. 33) is DENIED AS MOOT. All other pending motions not otherwise ruled upon are DENIED AS MOOT. The Clerk of the Court is instructed to CLOSE this case.

DONE AND ORDERED in Chambers at Miami, Florida, this 29th day of September, 2010.

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc:   All counsel of record